Garfield v. Hodges & Baldwin.

---

DESSIE H. GARFIELD, ADMINISTRATRIX, APPELLEE, V. HODGES & BALDWIN, APPELLANTS.

FILED OCTOBER 21, 1911. No. 16,540.

1. **Appeal: REVERSAL.** A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial awarded.

2. **Master and Servant: INJURY: EVIDENCE.** Evidence examined and discussed in the opinion *held* insufficient to sustain the judgment.

Garfield v. Hodges & Baldwin.

APPEAL from the district court for Dodge county: CONRAD HOLLENBECK, JUDGE. *Reversed.*

*Edgar M. Morsman, Jr.,* and *C. E. Abbott,* for appellants.

*Courtright & Sidner, contra.*

FAWCETT, J.

This action was brought by plaintiff, as administratrix of the estate of Penial J. Garfield, deceased, for damages by reason of the death of her husband, caused, as she alleges, by the negligence of defendants. Plaintiff recovered judgment below, and defendants appeal.

Defendants were engaged in the business of manufacturing and selling tombstones and monuments. In the course of their business, they handled large quantities of heavy stones, many of them weighing several tons each. These stones were purchased in carload lots, hauled by wagon from the cars, and piled in the yard adjacent to their shop. When the stones were brought to the yard, they were handled with a traveling crane. The business was under the charge of defendants themselves. No superintendent or boss of any kind was employed in or about their yards. When defendants were both away, every man in the shop was his own boss. When any of the workmen in the shop desired a stone from the yard, he would himself go to the yard, select the stone desired, and convey the same by use of the traveling crane into the shop. If any assistance was needed or desired, he would call some other employee to assist him. When the stones were placed in the yard, each stone would be elevated above the ground two inches or so by placing under it what are termed "chips of stone"; that is to say, pieces of stone which had been broken or chipped off of the larger slabs. This was done so that the chain could be slipped out at the time the stone was deposited, and in-

serted again when it was desired to move it, with the aid of the crane, into the shop. When getting in a car-load of stone, if it became necessary to place one stone upon another, a similar space of about two inches and similar blocking was used, so as to permit free use of the chain. The negligence charged against the defendants is: That on or about January 20, 1909, there was a large stone, about 9 feet long, resting upon two triangular stones, which, in turn, rested upon the ground; that these smaller stones were about 35 inches long north and south, each of the three sides being about 9 inches; the upper edge of the east base stone was about 19 inches west of one of the large posts of the crane track, and the other about 6 feet west of such post; that on that date the large stone was, by order of the defendants, cut in two, and the west portion removed; that the remnant of the stone was allowed to remain with one of the base stones above referred to as its sole support, which left the large stone, which is denominated A, nearly evenly balanced upon its supporting stone, extending about 18 inches east and west from the point of said base or fulcrum stone, and touching and being steadied against the west side of said large post, which post was about 19 inches from the center of the fulcrum; that it was left in that condition for five or six weeks, and until the injury complained of; that shortly after said date "the defendants placed on said stone A another stone, herein denominated as B, said upper stone B being about 36 inches long east and west, 18 inches high, and 31 inches wide north and south, and weighing about one ton. Said A and B thereupon were, and continued to be, supported only by said sharp edge fulcrum stone, and in an almost evenly balanced condition, with nothing to prevent them from toppling and falling to the west, and in such condition that they would necessarily topple and fall to the west if only a small amount of weight was placed on the west half of either of said stones. Said condition remained until the happening of the injury herein mentioned. * * *

During all of said time the regular course of conducting the said business of defendants was such as to necessitate and require the frequent and repeated passing and being of the various employees of defendant at a point immediately west of said balanced stones A and B, and said premises so left in said condition were at said point extremely dangerous, and said dangerous condition would have been easily and naturally noticed and observed by defendants and each of them in the exercise of ordinary care with reference to the providing a reasonably safe place for their workmen." That on March 4, 1909, the deceased, who was in the employ of the defendants, in the course of his duties, went to the yard for the purpose of getting a stone weighing several tons, and denominated C, which was at said time to be polished by him, "and which stone at said time was lying immediately south and adjacent to the two stones A and B." That deceased and another employee named Solomon Garfield (brother of deceased) were lifting stone C by means of the traveling crane, and to do so had a chain around stone C and attached to the traveling crane, and a rope running over a pulley, and together were hoisting stone C for the purpose of taking it into the shop; that both of said parties were standing on the north side of stone C, and immediately west of stones A and B; that after stone C had been raised to a certain height, the exact distance being unknown, Solomon Garfield, for the purpose of obtaining a better hold upon the rope and to facilitate the hoisting of stone C, "stepped over and upon said two stones A and B, and said stones A and B, being in a balanced condition, were by his weight tipped downward to the west and the upper stone, sliding off its blocks, fell over and upon said Penial J. Garfield, crushing his leg and inflicting injuries upon him which caused his death. It was customary for employees of the defendants to stand upon or walk upon the stones under said traveling crane, and had been for a long while, and said defendants well knew that it was necessary for and customary for

said employees to walk and step upon stones lying about and under said crane. Notwithstanding said fact, said defendants permitted said two stones to be and remain in a dangerous condition, the said portion of said large stone having been left in a balanced condition where any weight upon one side of it would cause it to tip, and said stone had been in that condition for about five or six weeks. Said Penial J. Garfield, through no fault of his own, was injured by and through the negligence of the defendant, hereinbefore more specifically set out, which said injury caused his death."

The answer admits the partnership and the business in which defendants were engaged; admits that the deceased, together with Solomon Garfield, was on March 4, 1909, raising a large stone; that Solomon Garfield stepped upon two adjacent stones and caused the upper one of said two stones to slide off, fall upon deceased, and injure his leg. Defendants aver that Solomon Garfield was at that time an employee of defendants and a fellow servant with the deceased; that the stone B was placed upon the stone A either by the deceased or by Solomon Garfield, or some other employee of defendants, a fellow servant of deceased, all without the consent or knowledge of defendants; that the accident happened in broad daylight; that deceased had been employed by defendants for many years, and was more familiar with the condition and situation of the various stones in the yard than defendants; that deceased, by the exercise of ordinary and reasonable care, could have known, and, as a matter of fact, did know, prior to the time of the accident, the exact condition and situation of the stones A and B; that it was the duty of deceased to attend to bringing into defendants' shop stone C; that in the performance of said duty deceased was the sole judge of the method and means of getting said stone into the shop; that it was likewise his duty to take all precautions necessary to ascertain and learn that the place where he was working was perfectly safe, not only for himself, but likewise for his fellow serv-

ants whom he might request to assist him in moving said stone; that, had deceased used ordinary care and diligence, stone C could have been moved into the shop with perfect safety, not only to deceased, but likewise to the other employees of defendants whom he might request to assist him in moving the stone; that in moving stone C into the shop it was entirely unnecessary for the deceased to stand in close proximity to stones A and B; that the situations and conditions of stones A and B were well known to deceased at the time that he stood immediately to the west thereof; that the injuries suffered by deceased and the accident which happened to him on said date were caused by, owing to, and the result of, his own carelessness and negligence, or of his fellow servants, or of both, which carelessness or negligence on the part of deceased or of his fellow servants, or of both, contributed to or resulted in said accident and the injury to deceased, and without which carelessness and negligence the accident and injury would not have happened. The reply was a general denial.

It will be observed that the issue of negligence on the part of defendants, as tendered by the petition, is clean cut. Succinctly stated, it is that defendants were negligent in permitting the stone A to remain in a nearly balanced condition after the other portion of it had been removed on January 20, and negligent in putting stone B on top of stone A shortly after January 20, and permitting the two stones A and B to remain in that condition for five or six weeks, and until the time of the accident on March 4. No other acts of negligence, either general or specific, are alleged. A careful examination of the record shows that plaintiff failed to prove either of the acts of negligence alleged. Solomon Garfield, the brother of deceased, who was present with him at the time of the accident, when called as a witness for plaintiff, testified: "Q. Did you at any time see any one set that top stone? A. No, sir. Q. Do you know when that top stone was set up there? A. No, sir; I do not." No witness produced by

plaintiff gave any testimony whatever as to when stone B was placed on top of stone A.

For the defendants, it was shown by the witness Whitenack that he was the employee who cut stone A and removed the west two-thirds thereof, and that after he had broken the stone and removed the west portion he thought the portion which he left was perfectly safe. At least one other witness testified that stone A, in the condition in which it was left by Whitenack, was perfectly safe. The testimony of at least two witnesses shows that as late as two days prior to the accident there was no stone resting on top of stone A, and that stone B was still, at that late date, resting on stone C. Not a single witness is produced to prove that defendants or any of their employees placed stone B on top of stone A, or that it was ever seen on top of stone A prior to the time that Solomon Garfield went into the yard to help his brother elevate stone C a few moments before the accident. Mr. Whitenack testified that when an employee would go to the yard to obtain a stone, if he found another stone resting upon it, he would have the upper stone removed. The testimony of other witnesses is that when the deceased went into the yard that morning, if he found stone B resting upon stone C and desired to take the latter stone into the shop, there was plenty of room to have deposited stone B upon the ground without putting it on top of stone A. It was also shown by the testimony of Solomon Garfield that whoever placed stone B on top of stone A placed between the two, as supports for stone B, four car-stakes, three inches thick, with tapered ends. All of the testimony above noted stands in the record uncontradicted. In the light of this clear and undisputed testimony, we do not see how unbiased minds could fail to reach any other conclusion than that, when the deceased went into the yard that morning to select a stone, and selected stone C, he found stone B resting upon it, and that he himself (which he could easily do with the use of the crane) removed stone B from stone C and placed it upon stone A. But

whether so or not, we are still confronted with the fact that the record before us is entirely barren of any evidence showing that defendants placed stone B on top of stone A shortly after January 20, and permitted it to so remain for five or six weeks, and until the time of the accident on March 4, or that defendants or any of their employees (unless deceased himself) ever placed stone B on top of stone A. It is clear, therefore, that plaintiff's allegation that defendants placed these stones together, and permitted them to so remain for five or six weeks, utterly fails for want of proof.

We are unable to agree with counsel that the failure of Whitenack or the defendants to place any additional blocking stones under stone A after Whitenack had removed the west two-thirds thereof, left that stone in a dangerous condition. Conceding that stone A was thereafter in a nearly balanced condition, and giving the benefit of every doubt against the testimony of Mr. Whitenack that when he removed the other portion the portion remaining tipped back against the post, and giving no weight to the testimony of Mr. Baldwin that it would have taken five or six hundred pounds to tip it the way in which it was tipped at the time of the accident, the fact would still remain that the stone in its then condition was not dangerous, for it could not tip more than about two inches, so that, if it had been so nearly balanced that the weight of a man stepping upon the west end would have tilted it, the tilt would have been so slight that it could not have caused any injury to the one who stepped upon it. The fact, therefore, that the defendants, or either of them, may have seen stone A in that condition prior to the injury, and did nothing to change its condition, would not be negligence on their part, for the reason that there was nothing to cause them to suspect that any one would place another stone on top of it, or that, if they did so, they would place between the two, as supports for the second stone, car-stakes with tapered ends. The evidence also shows that the deceased had worked for the defend-

ants about seven years; that his work was that of polishing; that in the discharge of his duties during all of those years he handled one-third of all of the stones that went into the shop; that when a stone was required he went out into the yard, selected such stone as he deemed suitable, and, with the aid of the crane, took it into the shop; that he would do this without direction of, or supervision by, any one; that he was his own boss and exercised his own judgment in that behalf; that if he desired assistance he would call some one from the shop, just as he did on the morning of the injury. When he went out that morning to get stone C, he went on his own initiative; he was right beside and had a plain view of stone A; and, if stone B was then resting upon stone A, the dangerous condition of the two stones could be plainly seen by him. His brother Solomon, when asked, "How do you know what support there was between the two stones?" answered, "It showed it plainly." "Q. You noticed them before you started to pull? A. Yes, sir; of course, I did not get down and examine them." If their condition showed so plainly that Solomon saw it without getting down and examining them, the deceased was in duty bound to have noted their dangerous condition and to have guarded against it. He not only owed that duty to the defendants and to his fellow servant, his brother, but he owed it to himself. He could not carelessly and negligently shut his eyes to or ignore the dangerous situation which confronted him, and charge the defendants with his own negligent act. Having elected to proceed with his work in the face of the dangerous situation or conditions from which his injury almost immediately resulted, we know of no theory upon which his administratrix can recover. The situation of the plaintiff is unfortunate, but the defendants were, upon the evidence in the record before us, in no manner responsible therefor. The conclusion here reached renders a consideration of the other points urged unnecessary. The rule is well settled in this state that, where a verdict is so clearly wrong as to induce the belief on the

part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, it will be set aside and a new trial granted. The evidence in the case at bar comes strictly within that rule. In our judgment, the verdict is so clearly wrong that it cannot be sustained upon any principle of justice.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

REESE, C. J., dissents.